UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'09 CIV 6441

JUDGE CHIN

-------------------------------------------------------------X

PERRY A. GRUSS,

                                 Plaintiff,

            -against-

DANIEL B. ZWIRN, D.B. ZWIRN & CO. L.P., and
D.B. ZWIRN PARTNERS, LLC

                              Defendants.

-------------------------------------------------------------X

Index No.

RECEIVED
JUL 20 2009
U.S.D.C. S.D. N.Y.
CASHIERS

COMPLAINT AND JURY
DEMAND

Plaintiff Perry A. Gruss ("Gruss") hereby alleges, as and for his Complaint, as follows:

## INTRODUCTION

1.      By the age of 35, Daniel B. Zwirn ("Zwirn") oversaw all investment and management decisions for the $5 billion hedge fund empire he had built, which employed hundreds of employees located in over ten offices throughout the U.S., Asia and Europe. As his business was growing at an uncontrollable pace, he had begun living the life of an investment magnate. He had a Gulfstream IV private jet, scores of professional and personal assistants, a vacation home on the East End of Long Island and engaged in the political and high society lifestyle. However, unlike many of Zwirn's peers, he could not yet afford all those luxuries and had to borrow heavily from commercial banks, the management company that ran his hedge fund business and even his limited partners.

2.      In late summer 2006, it was revealed to Zwirn's investors that his private Gulfstream IV jet had been purchased in part with his investors' money without their knowledge,

though the money had been returned several weeks later. It was also discovered that on a few occasions in the past the firm had collected its management fees before they were due.

3. Before these revelations would become public, Zwirn needed a scapegoat, someone upon whom he could pin the blame for these problems, giving himself plausible deniability while appeasing and reassuring his investors. Zwirn selected his fall guy – plaintiff Perry A. Gruss, Zwirn's partner and D.B. Zwirn & Co. L.P.'s (the "Company") Chief Financial and Administrative Officer. Rather than discuss these plans with Gruss directly, Zwirn began constructing a false and misleading story that Zwirn would spin to his investors after Gruss's departure.

4. Gruss was pressured to leave hastily on September 30, 2006, before investors found out about the problems. On that very day, Gruss and Zwirn discussed the situation, and Zwirn explained to Gruss that he had to separate from the Company because that was the only way for Zwirn to remain "pearly white" and "bullet proof." Zwirn agreed that Gruss was owed a sum of money for his share of partnership earnings, including money Zwirn had previously borrowed from Gruss.

5. With Gruss out of the way, investors were told a series of false and misleading statements which sought to blame Gruss for any conceivable control issues at the Company, and to shift the blame to Gruss without implicating Zwirn. Zwirn made hundreds of phone calls to investors over a period of several months, disseminating false information that Gruss was a criminal who had falsified documents to cover his tracks. Zwirn also circulated written memoranda which stated falsely that Gruss had "directed" a vast array of improper practices while claiming that Zwirn - known to be an inveterate micromanager - had no idea what was taking place.

6. Gruss brings this action to recover damages for defamation perpetrated by defendants, whose wrongful acts have ruined Gruss's professional standing and diminished his business and employment opportunities. Gruss also seeks damages for breach of contract arising from Zwirn's failure to pay Gruss amounts due to him in connection with his forced exit.

## THE PARTIES, VENUE, AND JURISDICTION

7. Plaintiff Perry A. Gruss is a former partner of D.B. Zwirn & Co. L.P. ("the Company"). He is a resident of the State of New Jersey.

8. Defendant Daniel B. Zwirn ("Zwirn") is the CEO, founding partner and managing partner of defendant D.B. Zwirn & Co. L.P. Zwirn resides in New York, New York.

9. D.B. Zwirn & Co., L.P. ("the Company") is a Delaware limited partnership with its principal place of business in New York, New York.

10. D.B. Zwirn Partners, LLC is a Delaware limited liability company with its principal place of business in New York, New York.

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Gruss is a citizen of the State of New Jersey, Zwirn is a citizen of the State of New York, and the Company and D.B. Zwirn Partners LLC are citizens of the States of Delaware and New York, and the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2), because all defendants reside within the Southern District of New York and a substantial part of the acts and omissions giving rise to the claims occurred in the Southern District of New York.

## THE OPERATION OF THE COMPANY

13.     In July 2002, Gruss was hired by Highbridge Capital Management to be the Chief Financial Officer of the Highbridge/Zwirn Special Opportunity Fund ("the Fund"), a multi-strategy hedge fund. Highbridge/Zwirn Capital Management LLC managed the Fund, and changed its name in early 2004 to D.B. Zwirn & Co. L.P.

14.     At the time of Gruss's arrival, there were only seven employees, all of whom worked in office space shared with Highbridge Capital Management. At first, Gruss's responsibilities included overseeing the Company's Finance and Operations groups. As the Company grew, Gruss traveled extensively and played a significant role in establishing foreign offices in London, Frankfurt, Hong Kong, Singapore, Taipei, and other locations. Gruss began taking on more administrative responsibilities and eventually Zwirn added Chief Administrative Officer to Gruss's title, and made Gruss a partner of the Company in January 2006. At that time, there were only four partners, only one of whom was asked to join after the partnership was founded.

15.     When Gruss began his employment, there were two employees in the back office or Operations staff who reported directly to him. By the time of his departure on September 30, 2006, well over 50 employees in the Operations and Finance groups located in New York, London, and Asia reported to Gruss, in addition to dozens of employees that loosely reported to Gruss in the Technology, Administration and Human Resources departments.

16.     Throughout his tenure, Gruss relied heavily on his direct reports, including Silvia Wu ("Wu") and Li Anne Law ("Law"), each of whom held the title of Financial Controller at various times. Both Wu and Law were Certified Public Accountants and Wu was also a Certified Financial Analyst. Gruss is neither a CPA nor a CFA.

17.    The Financial Controllers and the Operations department were responsible for day-to-day financial accounting and record keeping, and were the primary liaisons to the Fund's Administrators, Custodians and Banks. Additionally, the Financial Controllers were the primary contacts with the Company's external auditors, PricewaterhouseCoopers ("PWC") and were responsible for preparing the Fund's annual financial statements that were audited by PWC. The Financial Controllers and their direct reports were also responsible for working with the business units and the banks when preparing wire transfers for investments and expenses. Additionally, their group was responsible for reconciling all cash accounts for various hedge funds and managed accounts.

18.    In addition to the Financial Controllers, other employees had substantial responsibilities concerning administrative and financial matters. For example, Michelle O'Hara ("O'Hara") was in charge of accounts payable, and was responsible for tracking expenses and paying the Company's bills.

19.    As the Company's investment activities continued to grow, financing the Company's assets became critical. Indeed, Zwirn told Gruss that Gruss's single most important responsibility was to ensure the proper financing of the Company's $9 billion in assets. As such, Gruss spent a substantial amount of time working with Zwirn to negotiate financing facilities for the assets.

20.    In 2005, Zwirn decided to hire Harold Kahn ("Kahn") to serve as the Company's Chief Operating Officer. It was contemplated that Kahn would act as an elder statesman of the Company and focus mainly on Human Resources and Infrastructure activities, thus enabling Gruss to spend more time on financing the Company's assets.

## ZWIRN'S ROLE AS A MICROMANAGER

21.     As Chief Executive Officer and Managing Partner of the Company, Zwirn was an extraordinarily hands-on leader who paid strict attention to every detail of his business. Zwirn was involved intimately in all aspects of the Company's investment, legal, financial, managerial and operational matters. For example, Zwirn reviewed substantially all financial and operational details, including pricing, valuation, financing sources, financing obligations and Management Company and Fund expenses.

22.     Zwirn held formal weekly "funding pipeline" meetings to discuss the Company's funding requirements, financing and lending sources, as well as all investment allocation decisions. These meetings were attended by members of the Company's Legal, Tax, Finance, Operations, and Compliance departments.

23.     Zwirn also held formal meetings to discuss the Company's and his personal finances. These meetings were attended by Kahn, Tim Wong, Gruss, Zwirn and an outside accounting firm, BCRS, hired at the insistence of Zwirn. BCRS was engaged to review and compile financial data for the Company and Zwirn personally. Beginning in 2005, Zwirn began to focus extensively on his personal financial planning. Eventually Zwirn insisted on meeting at least twice a month to review his personal financial information and instructed Kahn to focus more on Zwirn's personal financial information.

24.     Indeed, Zwirn was such a micromanager that he insisted on being personally involved in all investment, finance, operations and other day to day activities. In an effort to raise additional funds to meet his investment commitments, Zwirn became consumed with strengthening his investor base, while trying to minimize the perception that his desire for

growth was putting a strain on his organization. He spent endless hours pouring over details and data and would constantly demand that reports be provided to him immediately, day or night, weekdays and weekends.

## ZWIRN'S PRIVATE JET AND THE EARLY COLLECTION OF MANAGEMENT FEES

25.    Zwirn was obsessed with growing the Company as fast as possible. As early as 2004, Zwirn's desire to increase the amount of assets under management very quickly strained the Company's ability to manage its cash flow. Despite the rising infrastructure costs and expenses, Zwirn insisted that the Company defer certain management and performance fees for tax reasons. This decision was made over the objections of Gruss. Subsequently, Zwirn would finally relent to Gruss's pleas and stopped the fee deferrals.

26.    The Company's cash flow problems were exacerbated by Zwirn's increased focus on his personal financial interests, which required the attention of additional Company employees, most notably Kahn. During 2005, Kahn began spending more of his time handling Zwirn's personal affairs at the expense of Company and Fund activities.

27.    Along with Zwirn, Kahn spearheaded all aspects of the purchasing, financing and maintenance of Zwirn's Gulfstream IV airplane, including negotiating letters of credit for plane-related expenses. (As set forth below, Zwirn later blamed Gruss for what appeared to be issues concerning these letters of credit). Additionally, Kahn focused on the purchase of Zwirn's family apartment on Central Park South. Kahn handled the mortgage for the apartment and arranged for a loan to Zwirn from his partners.

28.    Despite Gruss's objections that the Company did not have sufficient cash to purchase the plane, Zwirn insisted on proceeding. Over Gruss's objections, Zwirn insisted that the management company take out a loan from Citibank to cover the expenses related to the

plane, the down payment for Zwirn's apartment on Central Park South and the Company's operating expenses. The loan proceeds were used to repay certain management company operating expenses and money borrowed from the funds. The remaining proceeds were loaned to Zwirn and used as a down payment on his Central Park apartment. While this loan from his partners was documented, and Zwirn agreed to pay a market interest rate, Zwirn has yet to repay Gruss for Gruss's portion of the loan.

## ZWIRN AND THE COMPANY USE GRUSS AS A SCAPEGOAT

29.    In early-to-mid 2006, two issues came to light at the Company: (i) funds belonging to a third party managed account and certain hedge funds managed by the Company were used to pay company operating expenses and the down payment related to Zwirn's plane; and (ii) on at least three occasions, the Company had collected its management fees from investors approximately 30 days earlier than they were due.

30.    Gruss was not aware that investor funds had been used to purchase the plane. In fact, back office personnel had used a photocopied version of Gruss's signature to authorize two wire transfers to cover the down payment and subsequent expenses relating to the plane. Furthermore, with respect to the early collection of management fees, Gruss had asked the Financial Controller to document a loan for the early collection of fees but was told that it would not be necessary to do so. Shortly after the issues came to light, the Company asked its chief outside counsel, Schulte Roth and Zabel LLP ("Schulte"), to investigate.

31.    Even before Schulte completed its investigation, Zwirn blamed Gruss for these problems even though Khan and Zwirn had been responsible for negotiating all aspects of the airplane purchase and Gruss had been told that documentation of a loan for early collection of management fees was not required.

32.     Once Zwirn decided that Gruss would be blamed for the two issues, Gruss was forced to leave the Company. Zwirn advised Gruss that investors and other people would be told that he and the Company had decided to part ways. Zwirn clearly acknowledged that the partnership owed Gruss compensation in connection with his departure. Zwirn told Gruss that he believed Gruss was owed $2.6 million, but this understated the amount. As mentioned above, Zwirn told Gruss during this conversation that his termination was the only way that Zwirn could remain "pearly white" and "bulletproof."

33.     Accordingly, Gruss had to leave the Company and ceased to be a partner thereof on or about September 30, 2006. Gruss was not paid any of the compensation due to him as a partner and in connection with his departure. Gruss was the only individual forced to leave the Company at that time.

34.     In late October 2006, Zwirn had a series of telephone calls with investors to disclose the two issues. Zwirn falsely informed his investors that Gruss had "improperly expensed" items over an extended period of time. Zwirn's conversations with investors were described in an article that appeared in the New York Post on October 31, 2006, entitled "Hedge Loot Riddle."

35.     Upon information and belief, in addition to these conversations with investors, Zwirn made the same false statements orally to the Company's lenders, prime brokers and counterparties. A news article that appeared in the magazine Institutional Investor on November 24, 2008, entitled "The Agony of Dan Zwirn," stated that Zwirn made almost 200 such calls just on the weekend of October 28, 2006.

36.     Zwirn's statements were false because Gruss had not been responsible for charging investors with improper expenses. Gruss had no knowledge at the time that investor

money was used for Zwirn's airplane purchase and expenses, and had in fact not known about it until after the fact. Additionally, Gruss had relied on the judgment of the Financial Controller as to whether the early collection of the management fees had to be documented as a loan.

37. Zwirn and the Company made these statements for improper purposes, such as to shift the blame to Gruss and to protect Zwirn's reputation undeservedly.

38. Zwirn's widely-disseminated statements caused substantial harm to Gruss's reputation. Gruss has not been able to gain employment in a similar capacity and was unable to find any job within the finance industry because he was unfairly tarnished as incompetent, and worse, corrupt and dishonest. Many former colleagues and long-time acquaintances avoided Gruss after what was the equivalent of a public flogging.

39. Also in October 2006, the Company notified the United States Securities and Exchange Commission ("SEC") about its internal investigation into the payment for the plane and the early payment of management fees. The Company also hired the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to conduct its own investigation into these issues at the Company. Notably, during his several meetings with Schulte and Gibson Dunn, Gruss was not shown any documents, evidencing that his signature had been forged to effectuate the purchase of the plane, nor was he shown his email suggesting that there be documentation of a loan for the early collection of management fees. Gruss, however, was shown these documents, by the SEC in 2008.

40. Upon information and belief, in late 2006 and early 2007, Zwirn continued to have discussions with investors, prime brokers, counterparties and other people in the financial community in which he blamed Gruss for the problems that had beset the Company and repeated false statements about Gruss.

41.     Upon information and belief, in mid-March 2007, the SEC advised the Company that it had commenced an investigation of the company.

## THE COMPANY'S MARCH 2007 MEMO TO INVESTORS

42.     On March 26, 2007, Zwirn and the Company issued a memorandum ("the March 2007 Memo") to its investors purporting to describe the conclusions reached by Gibson Dunn's investigation. The March 2007 Memo was disseminated to the Company's investors and was also circulated within the financial community. In fact, Bloomberg News reported that it had obtained a copy and quoted from it in an article entitled "D.B. Zwirn Targeted By SEC Over Actions By Ex-Officer." The article identified Gruss the "ex-officer" who was described as responsible for the issues that led to the SEC investigation.

43.     However, the March 2007 Memo contained several false statements, including that: (i) Gruss had "directed" - reasonably understood by readers to mean that Gruss had organized, encouraged, or prompted - the improper accounting for the transactions; (ii) there was "no evidence that any current members of senior management," including Zwirn, had been aware contemporaneously of any of the facts concerning the subjects of the investigation; (iii) it was Gruss's responsibility to document "intra-fund transfers [which] were not properly accounted for and documented;" (iv) Gruss was responsible for administering "letters of credit for the benefit of the Funds, using the Funds' capital for collateral;" (v) Gruss had intentionally backdated documents about the performance of one of the funds by using an "as of" date; (vi) Gruss was responsible for the Company's "overcharg[ing] the Funds and a managed account for certain administrative expenses" by $12.2 million; and (vii) Gruss was aware that a subordinate had "mistakenly failed to include an incentive fee of approximately $3.6 million" when calculating the value of one of the funds.

44.     Additionally, the March 2007 Memo stated that money from a fund "was used to cover capital calls for an investment partnership held personally by three senior professionals associated with the firm." It also stated that the investigation "found no evidence that the three individuals had any knowledge that the former CFO and his staff used Fund assets to cover the capital calls." These statements falsely portrayed Gruss as deceitful and incompetent. In fact, at the time the capital calls were made, Zwirn and two other investors wrote personal checks to reimburse that fund, thereby demonstrating that they knew that the fund had made wire transfers on their behalf. During the investigation, Gruss advised Gibson Dunn to get copies of the checks Zwirn had written to cover the calls. To date, Gruss is unaware whether that advice was followed. Gruss was not party to the investment, nor was he member of the investment partnership.

45.     Furthermore, the March 2007 Memo stated that a portfolio manager, who left the firm in September 2005, "did not follow a systematic pricing methodology based on third-party broker quotes" to value an investment portfolio of high-yield bonds. Anyone reading the March 2007 Memo would understand that the Company was representing that Zwirn had not been aware of this issue and that Gruss was at fault. However, Zwirn personally signed off on every price and valuation decision on a monthly basis, and was acutely aware of the valuation of the high-yield bonds in question.

46.     Indeed, the valuation concern had been brought to Zwirn's attention twice, first by William Ding, the Company's Risk Manager, in 2005 and then by Gruss, Ding, and Shahid Ramzan, a Senior Portfolio Manager, in 2006. Although the pricing issue was deemed immaterial, Zwirn finally relented and after the second incident agreed that the prices had to be adjusted.

47.     Finally, the March 2007 Memo gave the false impression that Gruss had concealed or falsified records in an attempt to hide illegal or improper matters at the Company. Specifically, the Memo noted that Gibson Dunn's review had "uncovered additional instances of inappropriate conduct by our former CFO."

48.     At or around the time that the March 2007 Memo was distributed to investors and others, Zwirn made an enormous number of calls to investors, counterparties, prime brokers, and others in the financial community. During these calls, Zwirn made false comments that went beyond the information contained in the March 2007 Memo.

49.     Gruss is aware of documentary evidence, shown to him by the SEC, that Zwirn told at least one investor, Offit Hall Capital, that Gruss was "incompetent and eventually dishonest," and that, in an attempt to protect and advance his standing within the firm, Gruss had "covered up mistakes" and drafted "false documentation." Zwirn also stated that Gruss "would be criminally prosecuted." Not only were these statements false, but in the context of these communications, Zwirn gave the false impression that these statements were supported by the results of the Gibson Dunn investigation.

50.     Similarly, Zwirn told investors and other people who did business with the Company that Gruss would be "criminally prosecuted" and that he had committed fraud or some other serious crimes.

51.     In addition to publishing these false statements to the outside world, Zwirn repeated them indiscriminately to numerous individuals at the Company.

52.     Zwirn knew, and his knowledge is imputed to the Company, that these statements were false and/or that they were made with reckless disregard for their truth.

53.     Zwirn and the Company either failed to check readily available documents or ignored the evidence that demonstrated that these statements were false.

54.     Defendants failed to issue any corrective statements after Gruss brought several inaccuracies in the March 2007 Memo to the Company's attention.

55.     Zwirn and the Company made these statements for improper purposes, such as to harm Gruss and protect Zwirn's reputation.

56.     The publication of the March 2007 Memo and Zwirn's conversations with investors and others, caused harm to Gruss's reputation and standing in the financial community. Gruss was not able to obtain employment that was as lucrative as his partnership at the Company because of the wrongful conduct of Zwirn and the Company. Gruss lost business opportunities because other investors or hedge funds did not want to be associated with him.

## THE COMPANY'S BREACH OF CONTRACT

57.     Effective January 1, 2006, Gruss became a partner of the Company. In connection with naming Gruss as a partner, the Company drafted a document entitled "Supplementary Agreement Among D.B. Zwirn & Co., L.P., D.B. Zwirn Partners, LLC And Perry A. Gruss" ("the Agreement"). The Agreement set forth Gruss's rights and obligations in connection with becoming a partner. The Agreement referred to and incorporated the provisions of a Limited Partnership Agreement, dated as of March 24, 2004, of D.B. Zwirn & Co., L.P., and the Amended and Restated Limited Liability Company Agreement of D.B. Zwirn Partners, LLC.

58.     Gruss and Zwirn reached agreement on all terms of the Agreement even though it was never executed. The parties intended to be bound by the Agreement even though they did not execute it. An unexecuted copy of the Agreement prepared by the Company is attached. (*See* Exhibit A attached hereto.)

59.    Through September 2006, the parties performed pursuant to the terms of the Agreement, including the payment of incentive payments and payments based on the management of assets by the Company. Gruss received a Schedule K-1 for the year 2006, as a partner of the Company.

60.    Zwirn represented to the public and others at the Company that Gruss was a partner of the Company.

61.    Gruss worked for the Company in reliance on the obligations set forth in the Agreement.

62.    The Agreement, and the other agreements incorporated by reference, provided that the Company would pay Gruss if he withdrew from the partnership. These payments include the return of the balance of Gruss's capital account as well as certain management and incentive fees owed to Gruss as a partner of the Company. At the time of Gruss's departure, the amount owed to Gruss, as calculated pursuant to the Agreement, was approximately $3.0 million. In addition to the sum above, Mr. Gruss is owed approximately $171,000, which is 3% of the amount outstanding on the loan to Zwirn.

63.    On or about September 30, 2006, Gruss was forced to withdraw as a partner of the Company.

64.    Gruss demanded that the Company make the payments that were owed to him. To date, the Company has not paid amounts owed to Gruss. Upon information and belief, other partners were paid distributions under similar agreements.

## FIRST CAUSE OF ACTION
## DEFAMATION (AGAINST ZWIRN AND THE COMPANY)

65.    Plaintiff repeats and incorporates the allegations of paragraphs 1-64 as if fully set forth herein.

15

66.     On or about late October 2006, Zwirn and the Company directed false statements of purported fact concerning Gruss to be published to the public. These statements are described in more detail at paragraphs 34-35 and 40.[1]

67.     These statements portrayed Gruss falsely, impugned Gruss's integrity, and disparaged him in his trade and business, thereby constituting defamation *per se*.

68.     These statements were not privileged.

69.     Zwirn and the Company made these statements intending that they would be communicated widely within the financial community.

70.     Zwirn and the Company made these statements wrongfully and with actual malice, knowing them to be false and in reckless disregard of the truth.

71.     Zwirn and the Company made these statements intending to harm Gruss and diminish his reputation.

72.     Zwirn and the Company made these statements for improper motives, such as to harm Gruss and shield Zwirn from facing personal responsibility for internal control issues at the Company.

73.     As a result of these statements, Gruss suffered injury, damage, loss, or harm set forth herein.

74.     Gruss is entitled to general damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## DEFAMATION (AGAINST ZWIRN AND THE COMPANY)

75.     Plaintiff repeats and incorporates the allegations of paragraphs 1-74 as if fully set forth herein.

---

[1] In 2007, Plaintiff and the Company entered into an agreement to toll the statute of limitations for Plaintiff's defamation claims. On May 21, 2009, Plaintiff notified Zwirn and the Company of his intention to terminate the tolling agreement. (*See* Exhibit B attached hereto.)

76.     On or about late March 2007, Zwirn and the Company directed false statements of purported fact concerning Gruss to be published to the public. These statements are described in more detail at paragraphs 43-45 and 47-51.

77.     These statements portrayed Gruss falsely, impugned Gruss's integrity, and disparaged him in his trade and business, thereby constituting defamation *per se*.

78.     These statements were not privileged.

79.     Zwirn and the Company made these statements intending that they would be communicated widely within the financial community.

80.     Zwirn and the Company made these statements wrongfully and with actual malice, knowing them to be false and in reckless disregard of the truth.

81.     Zwirn and the Company made these statements intending to harm Gruss and diminish his reputation.

82.     Zwirn and the Company made these statements for improper motives, such as to harm Gruss and shield Zwirn from facing personal responsibility for internal control issues at the Company.

83.     As a result of these statements, Gruss suffered injury, damage, loss, or harm forth herein.

84.     Gruss is entitled to general damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT (AGAINST THE COMPANY
### AND D.B. ZWIRN PARTNERS LLC)

85.     Plaintiff repeats and incorporates the allegations of paragraphs 1-84 as if fully set forth herein.

86.    The Agreement, together with the documents it incorporates by reference, constitutes a valid and binding contract among Gruss, the Company, and D.B. Zwirn Partners, LLC.

87.    Gruss performed all his obligations under the Agreement.

88.    The Company asked Gruss to withdraw from the Company, thereby triggering a contractual duty to make payments to Gruss.

89.    The Company failed to make the required payments to Gruss.

90.    Gruss suffered damages because of the Company's breach of the Agreement.

## FOURTH CAUSE OF ACTION
### PROMISSORY ESTOPPEL (AGAINST THE COMPANY AND D.B. ZWIRN PARTNERS LLC)

91.    Plaintiff repeats and incorporates the allegations of paragraphs 1-90 as if fully set forth herein.

92.    The Agreement reflected clear and unambiguous promises to Gruss about how he would be compensated as a partner and the payments due to him if he left the Company.

93.    The Agreement provided that as a Partner, Gruss was entitled to an Incentive Percentage, a Management Percentage and an annual Guaranteed Payment of $225,000 as compensation.

94.    Gruss reasonably and foreseeably relied on these promises by continuing to work at the Company after he was named as a partner of the Company.

95.    Gruss reasonably and foreseeably relied on these promises when he agreed to withdraw from the Partnership and the Company.

96.     The Company's failure to pay Gruss compensation owed to him reflects an unconscionable injury.

## PUNITIVE DAMAGES

97.     Gruss is entitled to an award of punitive damages against Zwirn and the Company in an amount sufficient to punish defendants and discourage Defendants and others from engaging in similar conduct.

98.     As Defendants' conduct forced Plaintiff to retain counsel to prosecute this action, Plaintiff should also recover his attorney's fees.

WHEREFORE, Plaintiff Gruss respectfully demands that this Court enter judgment:

a.      On the First and Second Causes of Action, an amount to be determined at trial, but which is believed to exceed $6,500,000.

b.      On the Third and Fourth Cause of Action, an amount to be determined at trial, but which is believed to exceed $3,100,000, plus prejudgment interest from September 30, 2006 (which exceeds $700,000 to date).

c.      Enjoining defendants from making or directing further defamatory statements against Gruss.

d.      For punitive damages.

e.      For Gruss's attorneys' fees, costs, and disbursements in this action.

f.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial as to all issues.

Dated: New York, New York
      July 20, 2009

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

By: _____
    Jeffrey L. Liddle
    Ethan A. Brecher
    Maryana A. Kodner

800 Third Avenue
New York, NY  10017
(212) 687-8500
*Attorneys for Plaintiff*

# Exhibit A

SUPPLEMENTARY AGREEMENT AMONG
D.B. ZWIRN & CO., L.P., D.B. ZWIRN PARTNERS, LLC AND
PERRY A. GRUSS

This Supplementary Agreement, effective as of January 1, 2006 (this "Agreement"), reflects the agreement of D.B. Zwirn & Co., L.P. (the "Partnership") and D.B. Zwirn Partners, LLC, formerly known as Highbridge/Zwirn Partners, LLC (the "Company") with respect to certain matters otherwise within the discretion of the general partner of the Partnership and/or the managing member of the Company concerning the rights of Perry A. Gruss (the "Partner") under the Limited Partnership Agreement, dated as of March 24, 2004, of the Partnership (the "LP Agreement") and the Amended and Restated Limited Liability Company Agreement of the Company, dated as of March 24, 2004 (the "LLC Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the LP Agreement and the LLC Agreement.

1.    Incentive and Management Percentages; Guaranteed Payment.

(a)    From and after January 1, 2006, the Partner's Incentive Percentage and Management Percentage shall be determined in accordance with the mechanism set forth on [Exhibit A] to this Agreement (which shall be deemed to be a part of this Agreement), provided, however, that such percentages shall not be subject to dilution pursuant to Section 3.04(b)(ii) of the LP Agreement, Section 3.04(c)(ii) of the LP Agreement and Section 3.04(d) of the LLC Agreement, and that, for example, an increase in the Incentive Percentage or Management Percentage, as the case may be, of Zwirn, members of Zwirn's family, trusts for the benefit of Zwirn and/or members of his family, or any entities controlled by Zwirn and/or members of his family shall not decrease the Partner's Incentive Percentage or Management Percentage, as the case may be.

(b)    The Partner shall be entitled to a guaranteed payment at the annual rate of $225,000 (the "Guaranteed Payment") for so long as he shall remain a partner in the Partnership or a member of the Company. Such Guaranteed Payment shall be in addition to the Partner's Incentive Percentage and Management Percentage. To the extent that this Agreement is executed after January 1, 2006, Partner shall nevertheless be entitled to a Guaranteed Payment effective as of January 1, 2006.

(c)    The Partner shall not be required to defer any portion of his Guaranteed Payment or any income or distributions attributable to his Incentive Percentage or Management Percentage. In the event that the Partner elects not to defer any portion of his income received from the Partnership or the Company, he shall be required to contribute to D.B. Zwirn Special Opportunities Fund, L.P. or a successor fund thereto (collectively, the "Domestic Fund") an amount equal to at least 66% of all of the after-tax distributions made by the Company or the Partnership to the Partner (other than in respect of his Guaranteed Payment). In the event that the Partner elects to defer any portion of income received from the Partnership or the Company, he shall be required to contribute to the Domestic Fund an amount equal to at least 66% of all the after-tax distributions made by the Company or the Partnership to the Partner (other than in respect of his Guaranteed Payment) that have not been deferred by the Partner. At

such time that the Partner is no longer a partner in the Partnership and the Partner is no longer a member of the Company, he shall be permitted to withdraw any interest that he has in the Domestic Fund or any other Fund, subject to all applicable withdrawal provisions of the relevant Fund partnership agreement. Notwithstanding the foregoing, any interest that the Partner has in the Funds is fully vested, will not be subject to fees and may be withdrawn in the event of a personal emergency of the Partner or for a real estate investment to be made by the Partner subject to (i) the withdrawal provisions of the relevant Fund partnership agreement and (ii) any Partnership policies and procedures relating to such types of withdrawals.

2.    Non-competition Agreement. The Partner acknowledges and agrees that the granting of the Incentive Percentage and the Management Percentage to the Partner in Section 1 hereof is conditioned upon the Partner's executing and delivering to the Partnership the Partner Confidentiality, Non-compete and Non-solicit Agreement, by and between Partner, the Partnership, the Company, DBZ GP, LLC and Zwirn Holdings, LLC, previously provided to the Partner (the "Confidentiality Agreement"), the execution of which is hereby acknowledged.

3.    Liquidated Damages. The Partner acknowledges and agrees that the material breach or attempted or threatened material breach by him of Section 2.04 of the LP Agreement, Section 2.05 of the LLC Agreement or the provisions of the Confidentiality Agreement would cause irreparable injury to the Partnership or the Company, as the case may be, not compensable in money damages and that the Partnership or the Company, as the case may be, shall be entitled, in addition to all other applicable remedies (including liquidated damages provided for herein), to obtain a temporary and a permanent injunction and a decree for specific performance of Section 2.04 of the LP Agreement, Section 2.05 of the LLC Agreement or the provisions of the Confidentiality Agreement, as applicable, without being required to prove damages or furnish any bond or other security. The Partner further acknowledges and agrees that, but for his agreement to the provisions of Section 2.04 of the LP Agreement, Section 2.05 of the LLC Agreement and the provisions of the Confidentiality Agreement, his Incentive Percentage and Management Percentage would be significantly less than [      ]%. Therefore, in addition to any other remedies the Partnership or the Company has or may have, if the Partner materially violates Section 2.04 of the LP Agreement, Section 2.05 of the LLC Agreement or the provisions of the Confidentiality Agreement (and, in the case of a violation of the Confidentiality Agreement, such violation constitutes a Forfeiting Event (as defined in the Confidentiality Agreement)), the Partnership or the Company (as the case may be) shall be entitled to recover, as liquidated damages for unjust enrichment, the sum of one-half of all distributions made to the Partner during the 12 months prior to the violation.

4.    Modifications to the LP Agreement, the LLC Agreement and the Confidentiality Agreement. The Partnership, the Company and the Partner agree that this Agreement constitutes a supplementary agreement described in Section 2.09(b) of the LP Agreement and Section 2.09(b) of the LLC Agreement, that this Agreement is intended to modify the LP Agreement, the LLC Agreement and the Confidentiality Agreement and that, in the event of any conflict between the terms of this Agreement and the terms of the LP Agreement, the LLC Agreement or the Confidentiality Agreement, the terms of this Agreement shall control. The LP Agreement and the LLC Agreement are hereby modified as follows:

10079074.5

(a)    (i) Section 1.08 of the LP Agreement is hereby modified to allow the Partner to transfer up to twenty-five percent (25%) of his interest in the Partnership to a trust for his benefit or for the benefit of one or more immediate family members without the consent of the General Partner; provided, however, that, as a condition to any such transfer, the transferee shall agree to be bound by the LP Agreement and shall execute all documents reasonably requested by the General Partner in connection with such transfer and (ii) Section 1.08 of the LLC Agreement is hereby modified to allow the Partner to transfer up to twenty-five percent (25%) of his interest in the Company to a trust for his benefit or for the benefit of one or more immediate family members without the consent of the Managing Member; provided, however, that, as a condition to any such transfer, the transferee shall agree to be bound by the LLC Agreement and shall execute all documents reasonably requested by the Managing Member in connection with such transfer.

(b)    (i) Section 2.02(p) of the LP Agreement is hereby modified to provide that the Partnership acknowledges and understands that in the event of any litigation concerning a Forfeiting Event, the General Partner's determination will not be entitled to any presumption of correctness and (ii) Section 2.02(a)(xiv) of the LLC Agreement is hereby modified to provide that the Company acknowledges and understands that in the event of any litigation concerning a Forfeiting Event, the Managing Member's determination will not be entitled to any presumption of correctness.

(c)    (i)    (a) Section 2.08(a) of the LP Agreement is hereby modified to provide that expenses (including legal and other professional fees and disbursements) incurred by the Partner in any proceeding provided for in Section 2.08(a) of the LP Agreement will be paid by the Partnership in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of the Partner to repay such amount if it shall ultimately be determined that the Partner is not entitled to be indemnified by the Partnership as authorized under the LP Agreement and (b) Section 2.08(a) of the LLC Agreement is hereby modified to provide that expenses (including legal and other professional fees and disbursements) incurred by the Partner in any proceeding provided for in Section 2.08(a) of the LLC Agreement will be paid by the Company in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of the Partner to repay such amount if it shall ultimately be determined that the Partner is not entitled to be indemnified by the Company as authorized under the LLC Agreement.

(ii)    (a) Section 2.08(a) of the LP Agreement is hereby modified to provide that in the event of a dispute or any legal action between the Partner and the Partnership and/or any of its affiliates, the Partner shall not be entitled to any indemnification in connection therewith or the advancement of any expenses, and (b) Section 2.08(a) of the LLC Agreement is hereby modified to provide that in the event of a dispute or any legal action between the Partner and the Company and/or any of its affiliates, the Partner shall not be entitled to any indemnification in connection therewith or the advancement of any expenses.

(d)    (i) Section 2.11(b) of the LP Agreement is hereby modified to provide that other than as expressly provided in the LP Agreement, the Partner shall not be deemed to have any fiduciary duties to the General Partner or to any other Limited Partner and (ii) Section 2.11(b) of the LLC Agreement is hereby modified to provide that other than as

10079074.5

expressly provided in the LLC Agreement, the Partner shall not be deemed to have any fiduciary duties to the Managing Member or to any other member of the Company.

(e)     Section 3.11 of the LP Agreement and Section 3.11 of the LLC Agreement are hereby modified to provide that the Partner will be entitled to his same Incentive Percentage and Management Percentage in respect of any additional investment funds or managed accounts described in such Sections.

(f)     Section 4.05 of the LP Agreement and Section 4.05 of the LLC Agreement are hereby modified to provide that all distributions of unused reserves shall be made in the same manner as such reserves would have been distributed in the year in which the reserves were created.

(g)     Section 6.01(d) of the LP Agreement and Section 6.01(d) of the LLC Agreement are hereby modified to provide that in the event that the Partner is not entitled to any payments pursuant to either (i) Section 6.02(b)(ii) of the LP Agreement (as modified by this Agreement) or Section 6.02(b)(ii) of the LLC Agreement (as modified by this Agreement), as the case may be, or (ii) Section 11(c) of the Confidentiality Agreement, the Partner shall not be obligated to execute the releases referenced in such Sections.  Notwithstanding the foregoing, in the event that the Partner does not execute a release he shall still be entitled to receive any interest that he has in the Funds.

(h)     (A) Section 6.02(b)(i) of the LP Agreement is hereby modified to provide that (i) such Section shall not apply if the Partner is terminated by the Partnership for any reason other than a Forfeiting Event or if the Partner withdraws for Good Reason, (ii) in the event the Partner has withdrawn due to a Voluntary Withdrawal in accordance with Section 6.01(a) of the LP Agreement (as modified by this Agreement), the Partner shall be entitled to receive any unpaid Incentive Fees and Management Fees and any other Net Income in which the Partner would otherwise share with respect to any calendar year prior to the year in which the Partner provided notice of such Voluntary Withdrawal to the General Partner in accordance with said Section 6.01(a) (the year in which such notice is given being the "Notice Year") and (iii) in no event will the Partner forfeit any Deferred Fees under the Deferred Income Allocation Plan or any other deferred compensation arrangement related to a Fund and (B) Section 6.02(b)(i) of the LLC Agreement is hereby modified to provide that (i) such Section shall not apply if the Partner is terminated by the Company for any reason other than a Forfeiting Event or if the Partner withdraws for Good Reason and (ii) in the event the Partner has withdrawn due to a Voluntary Withdrawal in accordance with Section 6.01(a) of the LLC Agreement (as modified by this Agreement), the Partner shall be entitled to receive any unpaid Incentive Allocation and any other Net Income in which the Partner would otherwise share with respect to any calendar year prior to the year in which the Partner provided notice of such Voluntary Withdrawal to the Managing Member in accordance with said Section 6.01(a).

(i)     Section 6.02(b)(ii) of the LP Agreement and Section 6.02(b)(ii) of the LLC Agreement are hereby modified to provide that, in addition to situations involving the death or disability of the Partner, the provisions of such Sections shall apply if the Partner is terminated in the absence of a Forfeiting Event or if the Partner withdraws for Good Reason.

10079074.5

(j)        (i) Sections 6.02(b)(ii)(A)(1) and (2) of the LP Agreement are hereby modified to read in their entirety as follows: "(1) any Incentive Fee (multiplied by such Partner's Incentive Percentage), accrued for the calendar year in which the date of withdrawal (the "Withdrawal Date") occurs through the last day of the month immediately preceding the Withdrawal Date, based on the monthly investment reports provided to investors in the Funds; and (2) any Incentive Fee (multiplied by such Partner's Incentive Percentage) for the entire calendar year in which the withdrawal occurs"; and (ii) Sections 6.02(b)(ii)(A) and (B) of the LLC Agreement are hereby modified to read in their entirety as follows: "(A) any Incentive Allocation (multiplied by such Member's Incentive Percentage), accrued for the calendar year in which the date of withdrawal (the "Withdrawal Date") occurs through the last day of the month immediately preceding the Withdrawal Date, based on the monthly investment reports provided to investors in the Funds and (B) any Incentive Allocation (multiplied by such Member's Incentive Percentage) for the entire calendar year in which the withdrawal occurs".

(k)        Section 6.02(b)(iii) of the LP Agreement is hereby modified to provide that upon his withdrawal from the Partnership for any reason, the Partner will be entitled to receive all unpaid Deferred Fees, subject to all applicable tax laws and regulations, and Section 6.02(b)(iii) of the LP Agreement and Section 6.02(b)(iii) of the LLC Agreement are hereby modified to provide that upon his withdrawal from the Partnership for any reason, the Partner will also be entitled to receive (i) his interest as a limited partner in any Fund, (ii) his Investment Capital Account under the LLC Agreement, accrued until the date that the Investment Capital Account is paid to the Partner and (iii) all amounts in his capital accounts in both the Partnership and the Company.

(l)        Section 9.03 of the LP Agreement and Section 9.03 of the LLC Agreement are hereby modified to provide that without the Partner's prior written consent, the following rights or provisions will not be modified or amended if such modification or amendment would have an adverse effect on the Partner:

1)        The Partner's right to receive distributions,

2)        The Partner's Incentive Percentage or Management Percentage other than as provided in the LP Agreement, the LLC Agreement or this Agreement, and

3)        Sections 1.07, 2.07, 2.08, 3.02, 6.01, 6.02, 8.04 and 9.11 of each of the LP Agreement and the LLC Agreement (as each are modified by this Agreement), Section 2.04 of the LP Agreement and Section 2.05 of the LLC Agreement (as each are modified by this Agreement).

(m)        For purposes hereof, "Good Reason" shall mean the occurrence of any of the following, unless cured by the Partnership or the Company (as the case may be) within sixty (60) days after its receipt of notice thereof from the Partner: (i) [any reduction in the Partner's Incentive Percentage or Management Percentage in violation of this Agreement (including Exhibit A hereto) other than as provided for in the LP Agreement and the LLC Agreement (as modified hereby),] (ii) the relocation of the Partner's principal business office outside Manhattan, New York, provided, however, that the Partner may be relocated to another

10079074.5

office of the Partnership located in New York City or Connecticut so long as 80% of the investment professionals of the Partnership are relocated to such office, (iii) the assignment of duties to the Partner that are materially inconsistent with his position as a partner of the Partnership or the Partner's ceasing to report directly to Dan Zwirn (it being understood that the removal of Partner from a committee of the Partnership shall not be deemed "Good Reason"), (iv) a material diminution in the Partner's responsibilities as a partner of the Partnership or (v)[ a material reduction in the Partner's total compensation payable by either the Partnership or the Company (as the case may be) unless such reduction (1) is part of an overall compensation reduction plan implemented by the Partnership or the Company with respect to all Partners or all Members (as the case may be) or (2) is done in accordance with Exhibit A].

(n)     The definition of "Forfeiting Event" in both the LP Agreement and the LLC Agreement is hereby modified to conform to such definition in the Confidentiality Agreement.

(o)     Section 3.08 of the LLC Agreement is hereby modified to provide that the Partner will not be allocated any short-term capital gain under such Section in excess of his pro rata share (based upon his Incentive Percentage) of any short-term capital gain recognized by the Company.

(p)     Section 3.02(b) of the LP Agreement is hereby modified to clarify that, upon the request of the General Partner, the Partner shall be required to make additional capital contributions to the Partnership, pro rata with the other Partners of the Partnership, in accordance with their respective Incentive Percentages or Management Percentages, as the case may be, and Section 3.02(b) of the LLC Agreement is hereby modified to clarify that, upon the request of the Managing Member, the Partner shall be required to make additional capital contributions to the Company, pro rata with the other Members of the Company, in accordance with their respective Incentive Percentages.

(q)     (i)     Sections 3.05(d) and 4.04(e) of the LP Agreement and Sections 3.05(c) and 4.04(c) of the LLC Agreement are hereby modified to provide that in the event that there is a sale of all or substantially all of the business of the Partnership or the Company, as the case may be, or any similar extraordinary transaction unless the Partner consents otherwise, the Partner shall be entitled to receive his pro rata share (based on his Incentive and Management Percentage at the time of closing of such sale) of any sale proceeds, provided, however, that the Partner's share of such proceeds may be subject to vesting or related terms different from those imposed on the other Partners or Members, as the case may be.

(ii)     In the event that Zwirn is prepared to sell more than 50% of its interest in the Partnership or the Company, as the case may be, (1) unless the Partner consents otherwise, the Partner shall be entitled to sell at his option a pro rata share of his interest in the Partnership or the Company, as the case may be, at the same price, terms and conditions as Zwirn and the other Partners or Members, as the case may be, provided, however, that the Partner's share of the proceeds may be subject to vesting or related terms different from those imposed on other Partners or Members, as the case may be, and (2) Zwirn may require the Partner to sell a pro rata portion of such Partner's interest in the Partnership or the Company, as the case may be, at the same price, terms and conditions as Zwirn, so long as the Partner is

10079074.5

treated ratably with Zwirn and the other Partners or Members, as the case may be, provided, however, that the Partner's vesting or related terms may be different from those imposed on the other Partners or Members, as the case may be.

(r)     The provisions of the LLC Agreement and the LP Agreement, including, without limitation, the provisions of Section 1.07 and Section 3.02, are not intended to be for the benefit of any creditor or other person (other than the Partners or the Members in their capacities as such) to whom any debts, liabilities or obligations are owed by (or who otherwise have a claim against or dealings with) the Partnership, the Company or any Partner or Member, and no such creditor or other person shall obtain any rights under any of such provisions (whether as a third party beneficiary or otherwise) or shall by reason of any such provisions make any claim in respect of any debt, liability or obligation (or otherwise) including any debt, liability or obligation pursuant to Section 1.07, against the Partnership, the Company, any Partner or any Member.

(s)     The last sentence of Section 1 of the Form of Release attached as Exhibit A to the LP Agreement is hereby modified to read as follows: "Notwithstanding the foregoing, this Release shall not affect any rights that the Respondent may have under (A) Sections 2.08, 2.10, or 6.02 of the Limited Partnership Agreement of the Claimant, dated as of March 24, 2004, as modified by the Supplementary Agreement among D.B. Zwirn & Co., L.P., D.B. Zwirn Partners, LLC and Respondent dated as of January 1, 2006 (the "Supplementary Agreement"), (B) Sections 2.08, 2.10, or 6.02 of the Amended and Restated Limited Liability Company Agreement of D.B. Zwirn Partners, LLC, dated as of March 24, 2004, as modified by the Supplementary Agreement, and (C) Section 11(c) of the Partner Confidentiality, Noncompete and Nonsolicit Agreement among Claimant and certain of its affiliates and Respondent, dated as of January 1, 2006."

(t)     The last sentence of Section 1 of the Form of Release attached as Exhibit A to the LLC Agreement is hereby modified to read as follows: "Notwithstanding the foregoing, this Release shall not affect any rights that the Respondent may have under (A) Sections 2.08, 2.10, or 6.02 of the Amended and Restated Limited Liability Company Agreement of the Claimant, dated as of March 24, 2004, as modified by the Supplementary Agreement among D.B. Zwirn & Co., L.P., D.B. Zwirn Partners, LLC and Respondent dated as of January 1, 2006 (the "Supplementary Agreement"), (B) Sections 2.08, 2.10, or 6.02 of the Limited Partnership Agreement of D.B. Zwirn & Co., L.P., dated as of March 24, 2004, as modified by the Supplementary Agreement, and (C) Section 11(c) of the Partner Confidentiality, Noncompete and Nonsolicit Agreement among Claimant and certain of its affiliates and Respondent, dated as of January 1, 2006."

5.     Acknowledgment.  The Partner acknowledges that the Partner has been given the opportunity to ask questions of the Partnership and the Company and has consulted with counsel concerning this Agreement to the extent the Partner deems necessary in order to be fully informed with respect thereto.

6.     Miscellaneous.

10079074.5

(a)      Any notice required or permitted under this Agreement shall be in writing and shall be deemed given only when delivered personally or three days after being sent by certified mail, return receipt requested, postage prepaid, to the party hereto for which or whom such notice is intended at the Partnership's address (if to the Partnership), the Company's address (if to the Company), or at the Partner's address as set forth below (if to the Partner), or to such other address as any party hereto may hereafter specify by similar notice to the other parties hereto.

(b)      This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(c)      This Agreement cannot be amended or modified except by a writing signed by all parties hereto.  This Agreement may be executed in one or more counterpart copies, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

(d)      This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.  This Agreement shall not be assigned by any party hereto unless each non-assigning party shall have given its prior written consent to the assigning party to make such assignment.

(e)      If any provision of this Agreement shall be deemed invalid or unenforceable as written, it shall be construed, to the greatest extent possible, in a manner that shall render it valid and enforceable, and any limitations on the scope or duration of any such provision necessary to make it valid and enforceable shall be deemed to be part thereof, and no invalidity or unenforceability of any provision shall affect any other portion of this Agreement unless the provision deemed to be so invalid or unenforceable is a material element of this Agreement, taken as a whole.

(f)      The failure by any party hereto to enforce at any time any provision of this Agreement, or to require at any time performance by any party hereto of any provision hereof, shall in no way be construed as a waiver of such provision, nor in any way affect the validity of this Agreement or any part hereof, or the right of any party hereto thereafter to enforce each and every such provision in accordance with its terms.

(g)      Other than as modified in this Agreement, the Partner shall in all respects be subject to the LP Agreement and the LLC Agreement.

10079074.5

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date set forth above.

D.B. ZWIRN & CO., L.P.

DBZ GP, LLC,
its general partner

Zwirn Holdings, LLC,
its managing member


By: _____
   Name:
   Title:

D.B. ZWIRN PARTNERS, LLC

Zwirn Holdings, LLC,
its managing member


By: _____
   Name:
   Title:


_____
Perry A. Gruss

5 Iris Circle
Manalapan, NJ 07726

10079074.5

# Exhibit B

## TOLLING AND STANDSTILL AGREEMENT

This Agreement (the "Agreement"), dated as of June 28, 2007 (the "Effective Date"), is made and entered into between D.B. Zwirn & Co., L.P. ("DBZCO"), Daniel Zwirn ("Zwirn"); (DBZCO and Zwirn are sometimes referred to herein collectively as the "Zwirn Parties") and Perry A. Gruss ("Gruss") (all parties referred to collectively as the "Parties" and singularly as a "Party"), by the undersigned counsel on behalf of the Parties.

WHEREAS, the Parties agree that it makes sense to postpone any filing of the Parties' potential claims against each other for any damages for libel, slander or false words stated or made during the period from September 30, 2006 through the date of this agreement (the "Potential Claims," and if ultimately asserted, the "Claims" or "Claim") to avoid what may be the unnecessary expense and inconvenience connected with the institution of a formal legal proceeding; and

WHEREAS, the Parties desire to preserve their rights to assert at a later date any and all Potential Claims;

NOW, THEREFORE, for the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Any statute of limitations, statute of repose and other time-related defense or claim which are or may be applicable to any Potential Claims or Claims are hereby temporarily tolled such that they shall not expire at any time during the period this Agreement is in effect (the "Tolling Period").

2.  During the Tolling Period, no Party or any of its affiliates shall initiate a Suit against any other Party or any of its affiliates relating to the Potential Claims. Each Party represents and warrants that, as of the date hereof, it has not initiated, or caused to be initiated on its behalf, any Suit against any other Party relating to the Potential Claims. For purposes of this Agreement, "Suit" means any assertion to a state or federal court, or other tribunal, of liability or potential liability, or the absence thereof, whether by notice of an arbitration or by complaint, cross-claim, or counterclaim in a court proceeding.

3.  This Agreement shall not apply to any statute of limitations, statute of repose or other time-related defense or claim that has expired prior to the Effective Date.

4.  This Agreement shall be effective from the date hereof and continue in effect until the earlier of (A) September 30, 2009, or (B) ten business days after any Party gives written notice to any other Party of its wish to terminate this Agreement with respect to that Party, and such notice is received in accordance with the provisions of paragraph 12 below (the "Termination Date").

5.  If a complaint or other pleading asserting a Claim is filed by any Party against another Party, then any responsive pleading (and any counterclaims contained therein) which is served within the later of (a) the time period designated for the service of such responsive pleadings by applicable law or by stipulation of the parties, or (b) thirty (30) days after service of such complaint or other pleading, shall be treated, for purposes of any statute of limitations, statute of repose or other time-related defense or claim, as though such responsive pleading (and any counterclaim contained therein) had been brought on the Effective Date.

6.     Except as expressly provided for in any of the other paragraphs of this Agreement, this Agreement shall not prejudice or limit any defenses or claims that may be asserted by any Party.

7.     The execution of this Agreement is not, and shall not in any way operate as, an admission of liability, wrongdoing, or responsibility by the Parties to any person or entity, and nothing herein shall prejudice or affect any other rights or liabilities of the Parties or be used to form the basis of any liability against the Parties.

8.     This Agreement shall be maintained in confidence and shall not be disclosed to any third party, except any regulators, lawyers, accountants, auditors or insurers of the Parties hereto, unless ordered to do so by a court of competent jurisdiction, pursuant to judicial process, as required by law, or to the extent necessary to enforce or effectuate the terms of this Agreement, provided that prior to any such disclosure pursuant to an order of any such court, pursuant to judicial process, or as required by law, and to the extent not otherwise inconsistent with or prohibited by any such order, judicial process, or applicable law, the Party required to make the disclosure shall provide at least five business days notice to the other Parties.  This Agreement may not be introduced into evidence in any action or proceeding, except to the extent necessary to enforce or effectuate the terms of this Agreement.

9.     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to New York's choice of law principles.

10.    This Agreement constitutes the entire agreement and understanding among the Parties respecting the subject matter herein, and there are no other agreements among, on the one hand, Gruss, and on the other hand, the Zwirn Parties, except for any other agreements that may be embodied in a writing signed by the Parties.

11.    This Agreement shall not be modified except in a writing signed by the Parties.

12.    Any notices relating to or arising out of this Agreement shall be sent by overnight courier, express mail, certified mail (return receipt requested), or messenger; with an additional copy by facsimile and shall be addressed as follows:

If to Gruss:

Nick Akerman
Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177
(t) 212-415-9217
(f) 212-953-7201

If to DBZCO:

Audrey Strauss
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
(t) 212-859-8544
(f) 212-859-4000

2

D.B. Zwirn & Co., L.P.

BY: FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP

_____
           Audrey Strauss

Fried, Frank, Harris, Shriver
   & Jacobson LLP
One New York Plaza
New York, New York 10004
(t) 212 859-8544
(f) 212 859-4000

*Attorneys for D.B. Zwirn & Co., L.P.*

BY: LANKLER SIFFERT & WOHL LLP

_____
         John Siffert

Lankler Siffert & Wohl LLP
500 Fifth Avenue
33rd Floor
New York, New York 10110
(t) 212 921-8399
(f) 212 764-3701

*Attorneys for Daniel Zwirn*

551458

4

D.B. Zwirn & Co., L.P.

BY:  FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP

_____
        Audrey Strauss

Fried, Frank, Harris, Shriver
    & Jacobson LLP
One New York Plaza
New York, New York 10004
(t)  212 859-8544
(f)  212 859-4000

*Attorneys for D.B. Zwirn & Co., L.P.*


BY:  LANKLER SIFFERT & WOHL LLP


_____
        John Siffert

Lankler Siffert & Wohl LLP
500 Fifth Avenue
33rd Floor
New York, New York 10110
(t)  212 921-8399
(f)  212 764-3701

*Attorneys for Daniel Zwirn*


551458

4

If to Zwirn:

    John Siffert
    Lankler Siffert & Wohl LLP
    500 Fifth Avenue
    33rd Floor
    New York, New York 10110
    (t) 212-921-8399
    (f) 212-764-3701

13.    Any Party to this Agreement may change the addressee to whom its notices shall be sent by sending notice by overnight courier, express mail, certified mail (return receipt requested), or messenger; with an additional copy by facsimile as provided above.

14.    This Agreement may be executed in counterparts, each of which counterpart shall be original, but together shall constitute one and the same instrument.

15.    The Parties authorize their counsel to sign this Agreement on their behalf.

    IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

Perry A. Gruss

BY:  DORSEY & WHITNEY LLP

_Nick Akerman (w/ permission)_
          Nick Akerman

Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177
(t)  212-415-9217
(f)  212-953-7201

    *Attorneys for Perry A. Gruss*

3

# Liddle & Robinson, L.L.P.

### 800 Third Avenue
### New York, N.Y. 10022

(212) 687-8500

FACSIMILE: (212) 687-1505

www.liddlerobinson.com

E-mail: jliddle@liddlerobinson.com

MIRIAM M. ROBINSON (RETIRED)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

JAMES W. HALTER
STEPHEN J. STEINLIGHT
MARYANA A. KODNER
ANDREA M. PAPARELLA
REBECCA A. SAENGER
DINA N. WEINBERG
DAVID H. FELDSTEIN
SHERRY M. SHORE
AMY L. STUTIUS
JESSICA H. SAVAGE
MARIA W. WONG*

*AWAITING ADMISSION TO THE BAR

May 21, 2009

## VIA EXPRESS MAIL AND FACSIMILE

Audrey Strauss, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004

John Siffert, Esq.
Lankler, Siffert & Wohl LLP
500 Fifth Avenue, 33rd floor
New York, New York 10110

Re: Perry A. Gruss

Dear Ms. Strauss and Mr. Siffert:

We represent Perry A. Gruss.

Pursuant to the Tolling and Standstill Agreement (the "Agreement"), dated as of June 28, 2007, between D.B. Zwirn & Co., L.P., Daniel Zwirn and Perry A. Gruss (copy attached), we write to inform you that Mr. Gruss hereby provides notice of termination of the Agreement. The termination shall be effective as of ten (10) business days after the date of this letter, per paragraph 4(B) of the Agreement.

Mr. Gruss hereby reserves all rights and remedies available to him.

LIDDLE & ROBINSON, L.L.P.

Audrey Strauss, Esq.                              2                              May 21, 2009
John Siffert, Esq.

Should you have any questions, please contact me.

Very truly yours,

Jeffrey L. Liddle

cc:    Nick Akerman, Esq.
       Perry Grusss