```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED: July 10, 2013            │
└─────────────────────────────────────┘
```

PERRY A. GRUSS,

                    Plaintiff,

       -against-

DANIEL B. ZWIRN, D.B. ZWIRN & CO.,
L.P., and D.B. ZWIRN PARTNERS, L.L.C.,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

09 Civ. 6441 (PGG) (MHD)

PAUL G. GARDEPHE, U.S.D.J.:

        This is a defamation, breach of contract, and promissory estoppel action brought by Plaintiff Perry A. Gruss against Defendants D.B. Zwirn & Co., L.P.; D.B. Zwirn Partners, LLC (collectively, the "Zwirn Entities"); and Daniel B. Zwirn.  (Dkt. No. 1 (Complaint))  Gruss was formerly Chief Financial Officer of, and a partner in, D.B. Zwirn & Co., L.P. and its predecessor company.  Zwirn is the Chief Executive Officer and managing partner of the Zwirn Entities.  (Cmplt. ¶ 8)

        Pending before the Court is Gruss's objection – brought under Federal Rule of Civil Procedure 72(a) – to Magistrate Judge Dolinger's July 14, 2011 order (the "Order") denying Gruss's motion to compel production of certain interview notes and summaries that Defendants claim are protected by the attorney-client privilege and work-product doctrine.  For the reasons set forth below, Judge Dolinger's July 14, 2011 Order will be reversed to the extent that it holds that Defendants did not waive the attorney-client privilege and work product protection as to attorney notes and summaries of interviews, excerpts of which were voluntarily supplied to the Securities and Exchange Commission.

## BACKGROUND

In 2006, Defendants operated several hedge funds holding billions of dollars in assets.  In the summer of 2006, it came to light that investor funds had been used to purchase Zwirn's Gulfstream IV jet and that the Zwirn Entities had collected management fees from investor funds before they were due.  (Cmplt. ¶¶ 1-2, 25-29)  The Zwirn Entities hired Schulte, Roth and Zabel, LLP to conduct an internal investigation regarding these financial irregularities. (Cmplt. ¶ 30)  Schulte Roth attorneys interviewed employees of the Zwirn Entities, including Gruss and Zwirn, and drafted summaries of these interviews.  Gruss v. Zwirn, 276 F.R.D. 115, 122 (S.D.N.Y. 2011).  Gruss was ultimately blamed for the financial irregularities and resigned in the fall of 2006.  Id.; (Cmplt. ¶¶ 31-33).

In October 2006, Zwirn contacted investors in the Zwirn Entities' hedge funds and other stakeholders in the Zwirn Entities to inform them of Gruss's resignation.  Gruss, 276 F.R.D. at 122; (Cmplt. ¶ 34).  In these communications, Zwirn relied on talking points prepared by Schulte Roth.  Gruss, 276 F.R.D. at 122.

Defendants later hired Gibson, Dunn and Crutcher LLP to conduct a second internal investigation regarding the financial irregularities, and to notify the SEC of those irregularities and of the firm's findings.  (Cmplt. ¶ 39)  Gibson Dunn made presentations to the SEC concerning these matters on January 9 and March 20, 2007.  See Gruss, 276 F.R.D. at 122-23.  The Commission subsequently commenced its own investigation of the Zwirn Entities.  Id. at 123; (Cmplt. ¶ 41).  Defendants' disclosures to the SEC were entirely voluntary, and were not in response to a subpoena or any sort of investigative demand.

After Gibson Dunn completed its investigation, Zwirn disclosed the financial irregularities and the internal investigations to investors in the Zwirn Entities.  Gruss, 276 F.R.D.

at 123.  In these disclosures, Zwirn blamed Gruss for the irregularities and absolved himself of any responsibility.  Id.; (Cmplt. ¶¶ 34-56).

In the Complaint, Gruss asserts that Zwirn's statements to investors were false and defamatory.  (Cmplt. ¶¶ 65-84)  In particular, Gruss asserts that Zwirn misrepresented the results of Schulte Roth's investigation, which "'concluded that Harold Kahn, the Chief Operating Officer of the Zwirn Entities, was at a minimum willfully blind to both the use of investor funds for Zwirn's private jet and the early taking of management fees.'"  (Id. (quoting Oct. 12, 2010 Pltf. Br. 3))  The Complaint also includes breach of contract and promissory estoppel claims in which Gruss asserts that he is owed several million dollars under the partnership agreement. (Cmplt. ¶¶ 57-64, 85-96)

Defendants produced a number of documents regarding the Schulte Roth and Gibson Dunn internal investigations during discovery, including (1) a Schulte Roth memorandum dated September 11, 2006, which describes the firm's findings; (2) talking points generated by Schulte Roth for Zwirn's communications with hedge fund investors regarding Gruss's resignation; (3) Gibson Dunn PowerPoint presentations that the firm used in reporting its findings to the SEC on January 9 and March 20, 2007; (4) a second set of talking points, also generated by Schulte Roth, for Zwirn's further communications with investors regarding the financial irregularities and the internal investigations; and (5) a March 26, 2007 memorandum from the Zwirn Entities – concerning Gibson Dunn's findings – that the Zwirn Entities issued to investors.  Gruss, 276 F.R.D. at 123.

The Gibson Dunn PowerPoint presentations to the SEC purport to set forth summaries of what twenty-one witnesses told Gibson Dunn and Schulte Roth.  (Oct. 12, 2010 Brecher Aff., Exs. F, G)  Gibson Dunn's presentations to the Commission are governed by a

November 14, 2006 agreement entered into by Fried, Frank, Harris, Shriver & Jacobson LLP –

Defendants' regulatory counsel – and the SEC.  (Oct. 26, 2010 O'Brien Decl., Ex. H)  That

agreement reads as follows:

> Our firm represents D.B. Zwirn & Co. L.P. ("DBZ") and in connection with that representation we contacted the Staff of the U.S. Securities and Exchange Commission (the "Staff") on October 30, 2006.  As a result of that call, a meeting is scheduled with the Staff of the Northeast Regional Office on November 15, 2006.  This letter is written to set forth the understandings between the Staff and DBZ with respect to that meeting.
>
> On or about October 16, 2006, DBZ retained Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to commence an investigation into certain issues at DBZ.  In connection with this matter, Schulte Roth & Zabel LLP ("Schulte Roth") previously reviewed certain issues at DBZ currently under investigation by Gibson Dunn.  Fried, Frank, Harris, Shriver & Jacobson LLP is representing DBZ in connection with the subject matter of the investigation and in any litigation or other matters arising out of the investigation, including regulatory interaction.  In light of the interest of the Staff in determining whether there have been any violation of the federal securities laws, and DBZ's interest in investigating and analyzing the circumstances and people involved in the events at issue, DBZ will provide an oral briefing by the above counsel to the Staff on November 15, 2006 and in the future at agreed upon intervals (the "Briefings").  In the course of the Briefings, it is anticipated that counsel for DBZ, including Schulte Roth and Gibson Dunn, may discuss and disclose, among other things, matters that are subject to DBZ's attorney-client privilege or to work product protection ("Protected Materials").
>
> Please be advised that by providing or disclosing the Protected Materials to the Staff pursuant to this agreement, DBZ does not intend to waive the protection of the attorney-work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties.  DBZ believes that the Protected Materials are protected by, at minimum, the attorney work product doctrine and the attorney client privilege.  DBZ believes that the Protected Materials warrant protection from disclosure.
>
> The Staff will maintain the confidentiality of the Protected Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities.
>
> The Staff will not assert that the disclosure of the Protected Materials constitutes a waiver of the protection off the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party.  The Staff agrees

that disclosure of the Protected Materials provides the Staff with no additional
grounds to subpoena testimony, documents or other privileged materials from
DBZ, although such grounds that may exist apart from such discussions shall
remain unaffected by this agreement.

The Staff's agreement to the terms of this letter is signified by your signature on
the line provided below.

(Id.)

After receiving the PowerPoint presentations and the other documents listed
above in discovery, Gruss sought production of attorneys' notes and summaries of all witness
interviews conducted by Schulte Roth and Gibson Dunn attorneys during their respective
investigations.  Gruss, 276 F.R.D. at 123-24.  Defendants opposed Plaintiff's discovery requests,
claiming that the notes and summaries are protected by the attorney-client privilege and the
work-product doctrine.  Id. at 124.  Plaintiff subsequently moved to compel production of these
materials under Federal Rule of Civil Procedure 37.  Id.

## The Magistrate Judge's Decision

This Court referred the parties' discovery dispute to Magistrate Judge Dolinger on
November 10, 2010.  (Dkt. No. 30)  On July 14, 2011, Judge Dolinger issued an order denying
Plaintiff's motion to compel.  Gruss, 276 F.R.D. 115; (Dkt. No. 37).

In a thorough and scholarly opinion, Judge Dolinger made a number of rulings
that Plaintiff has not challenged, including the following:

1. the notes and summaries of interviews prepared by Gibson Dunn and Schulte Roth
   are protected by the attorney-client privilege (id. at 125);

2. to the extent that the witness interview notes and summaries contain opinion work
   product, they are protected by the work-product privilege (id. at 129); and

3. Plaintiff has not made a sufficient showing to justify discovery of the opinion work
   product contained in the interview notes and summaries.  Id. at 131.

5

Judge Dolinger also addressed Plaintiff's argument that Defendants had waived the attorney-client privilege and work product protection as to the witness interview notes and summaries by making "'selective use of [these] privileged materials'" – quoting certain portions of the interview notes and summaries – in their presentations to the SEC.  Id. at 132 (quoting Oct. 12, 2010 Pltf. Br. 16).

In considering Plaintiff's waiver argument, Judge Dolinger began by noting that

> [t]he attorney-client privilege and work-product immunity may be waived by selective disclosure of only part of a protected communication or document, since a party "may not rely on the protection of the privilege regarding damaging communications while disclosing other self-serving communications."

Id. at 140 (quoting Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust, 43 A.D.3d 56, 64 (1st Dept. 2007).  Judge Dolinger further noted that, in such circumstances, the privilege is waived and work product protection is lost both as to the adversary to whom the selective disclosure was made (id. at 141 (citing SEC v. Beacon Hill Asset Mgmt. LLC, 231 F.R.D. 134, 143 (S.D.N.Y. 2004); In re Kidder Peabody Secs. Litg., 168 F.R.D. 459, 472 (S.D.N.Y. 2000)), and as to third parties.  Id. (citing In re Steinhardt Partners, L.P., 9 F.3d 230, 235-36 (2d Cir. 1993).

Judge Dolinger also acknowledged, however, that the Second Circuit has suggested, in dicta, that waiver might not be found where "'the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials,'" (id. (quoting Steinhardt, 9 F.3d at 236)), and noted that "defendants' limited disclosures to the SEC were pursuant to an express confidentiality agreement, which reserved the application of the attorney-client and work-product privileges."  Id. at 142 (citing O'Brien Decl., Ex. H).  Judge Dolinger further noted that:  (1) Defendants had not "voluntarily disclosed part or all of the interview notes and summaries to any . . . actual or potential

adversary [other than the SEC]"; and (2) that Plaintiff sought the disclosure not of the materials given to the SEC, but rather the witness interview notes and summaries underlying the Powerpoint presentations made to the SEC.  Id.  "Given the existence of defendants' confidentiality agreement with the SEC and the absence of any other circumstances arguing in favor of a subsequent waiver," Judge Dolinger found that "defendants' disclosures to the SEC [do not constitute] a waiver of the privilege in the undisclosed portions of the interview notes and summaries as to plaintiff."  Id.

On July 27, 2011, Plaintiff objected to that portion of Judge Dolinger's Order holding that "Defendants did not waive any privileges associated with the Gibson Dunn and Schulte Roth interview notes and summaries when they produced the findings of these firms' investigations – including portions of the substance of the interview notes and summaries in the form of witness statements – to the Securities and Exchange Commission."  (July 27, 2011 Pltf. Br. (Dkt. No. 38) at 1)  Plaintiff's submissions state, however, that he is seeking only "factual interview notes reflecting the statements made by the witness[es]," and that Plaintiff is not seeking disclosure of the interview notes and summaries that disclose "counsels' opinion or analytical process."  See Aug. 26, 2011 Pltf. Reply Br. 1 n.1; July 27, 2011 Pltf. Br. 11.

## DISCUSSION

## I.    STANDARD OF REVIEW

Pretrial discovery matters, "including those regarding privilege issues, are nondispositive matters."  Eisai Ltd. v. Dr. Reddy's Labs., Inc., 406 F. Supp. 2d 341, 342 (S.D.N.Y. 2005) (citing Tompkins v. R.J. Reynolds Tobacco Co., 92 F. Supp. 2d 70, 74 (N.D.N.Y. 2000)).  Under Federal Rule of Civil Procedure 72, "[w]hen a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide. . . .

[t]he district judge . . . must consider timely objections [to the magistrate judge's decision] and modify or set aside any part of the order that is clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).

A ruling is "clearly erroneous" where, "although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed."  United States v. Chowdhury, 639 F.3d 583, 585 (2d Cir. 2011) (citing Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)); see also Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 282 F.R.D. 76, 78 (S.D.N.Y. 2012) ("'The reviewing court must be left with the definite and firm conviction that a mistake has been committed to overturn the magistrate judge's resolution of a nondispositive matter.'") (quoting AMBAC Fin. Servs., LLC v. Bay Area Toll Auth., No. 09 Civ. 7062 (RJH), 2010 WL 4892678, at *2 (S.D.N.Y. Nov. 30, 2010)).  "An order is 'contrary to law' when it 'fails to apply or misapplies relevant statutes, case law or rules of procedure.'"  WestLB AG v. BAC Fla. Bank, No. 11 Civ. 5398 (LTS) (AJP), 2012 WL 3135773, at *3 (S.D.N.Y. Aug. 2, 2012) (quoting Collens v. City of N.Y., 222 F.R.D. 249, 251 (S.D.N.Y. 2004)).

"Magistrate judges are given broad latitude in resolving discovery disputes, including questions of privilege."  Thompson v. Keane, No. 95 Civ. 2442 (SHS) (AJP), 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996) (citing Alpex Computer Corp. v. Nintendo Co., Ltd., No. 86 Civ. 1740 (KMW), 1992 WL 51534, at *1 (S.D.N.Y. Mar. 10, 1992)).  "Courts in this Circuit have held that a magistrate's ruling on a discovery dispute should be overturned only for an abuse of discretion."  Arista Records LLC v. Lime Group LLC, No. 06 Civ. 5936 (KMW), 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011) (citing Edmonds v. Seavey, No. 08 Civ. 5646 (HB), 2009 WL 2150971, at *2 (S.D.N.Y. July 20, 2009) (noting that the fact that "reasonable

minds may differ on the wisdom of granting [a party's] motion is not sufficient to overturn a magistrate judge's decision")).

## II.    THE SELECTIVE WAIVER DOCTRINE

The Second Circuit has not issued a precedential decision addressing the question posed by Gruss's appeal:  whether voluntary disclosure of privileged documents to a governmental agency such as the SEC constitutes a waiver of the privilege as to underlying documents and vis-à-vis third parties, where the disclosing party and the governmental agency entered into the type of confidentiality agreement at issue here.  The Court will first address the origin and current viability of the "selective waiver" doctrine, and then address the effect of the agreement entered into by Defendants and the SEC.

### A.    Origin and Viability of the Selective Waiver Doctrine

The leading case for "selective waiver" – in the context of attorney-client privilege – is Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1978) (en banc).  In that case, Diversified had provided the documents at issue – memoranda of employee interviews conducted by outside counsel – to the SEC in response to a subpoena.  Diversified, 572 F.2d at 599, 601.  A third party sought these memoranda in a subsequent tortious interference and antitrust litigation.  Id. at 600.  The Eighth Circuit concluded that "[a]s Diversified disclosed these documents in a separate and nonpublic SEC investigation . . . only a limited waiver of the [attorney-client] privilege occurred."  Id. at 611.  The court noted that "[t]o hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers."  Id.

9

The reasoning of the <u>Diversified</u> court – on which the selective waiver doctrine is premised – has been uniformly rejected by the Courts of Appeal, including by the Second Circuit in <u>In re Steinhardt Partners, L.P.</u>, 9 F.3d 230 (2d Cir. 1993).

### B.   The Second Circuit's Steinhardt Decision

In <u>Steinhardt</u>, the SEC was investigating allegations of wrongdoing in the market for Treasury notes, and asked Steinhardt's counsel to "submit a memorandum that would address the facts and issues involved in the case and discuss the relevant legal theories."  <u>Steinhardt</u>, 9 F.3d at 232.  Counsel prepared a submission that apparently persuaded the SEC not to bring an enforcement action.  <u>Id.</u>  The submission was provided to the SEC with no agreement as to confidentiality.  Several parties in a related class action later sought production of these materials.  <u>Id.</u>

The Second Circuit found that the memorandum and its exhibits had been submitted voluntarily to the SEC, and that Steinhardt was in an adversarial posture with the SEC at that time.  <u>Id.</u> at 234.  In making this finding, the court noted that "the presence of an adversarial relationship does not depend on the existence of litigation," and "the fact that Steinhardt cooperated voluntarily does not transform the relationship from adversarial to friendly."  <u>Id.</u>

The court then turned to the issue of whether Steinhardt's voluntary disclosure of its counsel's memorandum to the SEC resulted in a waiver of work-product protection.

> The logic behind the work product doctrine is that opposing counsel should not enjoy free access to an attorney's thought processes.  An attorney's protected thought processes include preparing legal theories, planning litigation strategies and trial tactics, and sifting through information. . . .Common sense and the practicalities of litigation define the limits of the work product doctrine.  <u>Once a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears.</u>  Courts therefore accept the waiver doctrine as a limitation on work product protection.  <u>The waiver doctrine provides</u>

10

> that voluntary disclosure of work product to an adversary waives the privilege as
> to other parties.

Id. at 234-35 (emphasis added and citations omitted).

The court went on to find that "Steinhardt waived any work product protection by voluntarily submitting the memorandum to the SEC." Id. at 235.  In doing so, the Circuit explicitly rejected the reasoning of Diversified:

> The Diversified opinion based its "selective waiver" theory on the policy
> consideration that if voluntary disclosure to the SEC waives privilege as to
> subsequent private litigants, parties might be discouraged from cooperating with
> governmental investigations. . . .
>
> However, the Supreme Court has rejected attempts to use the work-product
> doctrine to sustain a unilateral testimonial use of work-product materials. [And
> w]e have previously denied a claim of privilege after a claimant decided to
> selectively disclose confidential materials in order to achieve other beneficial
> purposes.  Similarly, we now reject Steinhardt's attempt to use the doctrine to
> sustain the unilateral use of a memorandum containing counsel's legal theories
> voluntarily submitted to an investigatory body.

Id. (internal quotation and citations omitted).

In finding that work product protection had been waived, the Second Circuit emphasized that "selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage." Id.  The court also noted that those waiving such protection generally do not do so for altruistic reasons: "[v]oluntary disclosure is generally made because a corporation believes that there is some benefit to be gained from disclosure. . . . Voluntary cooperation offers a corporation an opportunity to avoid extended formal investigation and enforcement litigation by the SEC, the possibility of leniency for prior misdeeds, and an opportunity to narrow the issues in any resulting litigation." Id. at 235-36.

11

Nevertheless, the Steinhardt court "decline[d] to adopt a per se rule that all voluntary disclosures to the government waive work product protection":

> Crafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis.  Establishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a common interest in developing legal theories and analyzing information, or situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials.

Id. at 236 (citations omitted).

In sum, in Steinhardt, the Second Circuit held that a party's voluntary submission to a governmental agency in an adversarial posture of a document containing attorney work product waives work product protection in that document. [1]  The court suggested in dicta that a

---

[1]   The Second Circuit's rejection of the selective waiver doctrine is consistent with the law throughout the nation.  See, e.g., In re Pacific Pictures Corp., 679 F.3d 1121, 1127-28 (9th Cir. 2012) (rejecting selective waiver doctrine and reasoning of Diversified in context of attorney-client privilege; noting that doctrine does not encourage full disclosure to one's attorney, but rather encourages voluntary disclosure to the government, "thereby extending the privilege beyond its intended purpose" and essentially "creating an entirely new privilege" that Congress had not endorsed); In re Qwest Commc'ns Int'l Inc., 450 F.3d 1179, 1195 (10th Cir. 2006) (rejecting selective waiver doctrine in the context of both attorney-client privilege and work product where documents had been provided to SEC and DOJ; "the proposed exception would [not] promote the purposes of the attorney-client privilege or work-product doctrine . . . [but] could have the opposite effect of inhibiting such communication[;] [i]f officers and employees knew their employer could disclose privileged information to the government without risking a further waiver of attorney-client privilege, they may well choose not to engage the attorney or do so guardedly"; "selective waiver does little to further [the] purpose [of enabling counsel to prepare a case in privacy,] and in some cases, may instead encourage counsel to conduct investigations with an eye toward pleasing the government"); In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 302-03, 306-07 (6th Cir. 2002) ("reject[ing] the concept of selective waiver, in any of its various forms[,]" including in the context of both the attorney-client privilege and work product doctrine; "[t]he attorney-client privilege was never designed to protect conversations between a client and the Government – i.e., an adverse party – rather, it pertains only to conversations between the client and his or her attorney"; "attorney-client privilege is a matter of common law right[,] . . . not a creature of contract, arranged between parties to suit the whim of the moment"; "[o]ther than the fact that the initial waiver must be to an 'adversary,' there is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege[;] [m]any of the reasons for disallowing selective waiver in the attorney-client privilege context also apply to the work product doctrine";

different outcome might be appropriate where the disclosing party and the government shared a common interest, or where the government agency had explicitly agreed to maintain the disclosed materials as confidential.

### III.   WHETHER DEFENDANTS' CONFIDENTIALITY AGREEMENT WITH THE SEC PROTECTS THE ATTORNEY NOTES AND SUMMARIES OF WITNESS INTERVIEWS FROM DISCLOSURE

There is no question here that the relationship between Defendants and the SEC was adversarial, regardless of the fact that the disclosures were voluntary.  Defendants do not contend otherwise.  It is clear that they self-reported the financial irregularities to the SEC in order to escape or limit liability.  Indeed, the confidentiality agreement on which Defendants rely recites that the SEC is engaged in an investigation designed to "determin[e] whether there have been any violations of the federal securities laws. . . ."  (O'Brien Decl., Ex. H)  Under such circumstances, an adversarial relationship exists.  See, e.g., Steinhardt, 9 F.3d at 234 ("The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation. . . . Even though the SEC's investigation has not resulted in any formal enforcement proceedings against Steinhardt, the presence of an adversarial

---

"[e]ven more than attorney-client privilege waiver, waiver of the protections afforded by the work product doctrine is a tactical litigation decision"); United States v. Mass. Inst. of Tech., 129 F.3d 681, 687 (1st Cir. 1997) ("MIT's disclosure to the audit agency was a disclosure to a potential adversary.  The disclosures did not take place in the context of a joint litigation where the parties shared a common legal interest. . . . The cases treat this situation as one in which the work product protection is deemed forfeit."); Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1418, 1425, 1429 (3d Cir. 1991) (holding that "by disclosing documents to the SEC and to the DOJ, Westinghouse waived both the attorney-client privilege and the work product doctrine with respect to those documents. . . . as against all other adversaries"); In re Martin Marietta Corp., 856 F.2d 619, 623-24 (4th Cir. 1988) ("The Fourth Circuit has not embraced the concept of limited waiver of attorney-client privilege."); In re Subpoenas Duces Tecum, 738 F.2d 1367, 1372 (D.C. Cir. 1984) ("We are convinced that the health of the adversary system – which spawned the need for protection of an attorney's work product from discovery by an opponent – would not be well served by allowing appellants the advantages of selective disclosure to particular adversaries, a differential disclosure often spurred by considerations of self-interest.")

relationship does not depend on the existence of litigation. . . .  Additionally, the fact that Steinhardt cooperated voluntarily does not transform the relationship from adversarial to friendly.")

Under <u>Steinhardt</u> and its progeny, when a party provides documents to a government adversary under such circumstances, it ordinarily waives both attorney-client privilege and work product protection as to those documents.  Perhaps in recognition of these precedents, Defendants produced in discovery the materials they supplied to and used during their presentations to the SEC.  Defendants argue, however, that a different outcome is required as to the attorney notes and summaries of witness interviews underlying their presentations to the SEC, even though they presented excerpts of these witness interviews to the SEC.  Defendants contend that these attorney notes and summaries are protected from disclosure because of their confidentiality agreement with the SEC.[2]  (Aug. 10, 2011 Def. Br. 7-12)

A.      **<u>Steinhardt</u>**

The <u>Steinhardt</u> court suggested in <u>dicta</u> that the presence of a confidentiality agreement between the disclosing party and the government agency might affect the waiver analysis.  The court had no occasion to address the sort of confidentiality agreement that might affect the waiver analysis, of course, because Steinhardt had no confidentiality agreement of any sort with the SEC.

---

[2]  Given Defendants' assertion that their confidentiality agreement with the SEC preserves attorney-client privilege and work product protection as to materials shared with the SEC, it is curious that they produced the PowerPoint presentations in discovery.  This strategic decision suggests either that Defendants are not confident that the confidentiality agreement preserves privilege, or that they believe producing the presentations they made to the SEC – while withholding the underlying witness notes and summaries – serves their interests in this litigation.

The confidentiality agreement at issue here provides no meaningful protection to Defendants because – in essence – it grants the SEC discretion to disclose the submitted materials whenever it chooses.  The agreement provides that

> [t]he [SEC] Staff will maintain the confidentiality of the Protected Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is required by law or <u>would be in furtherance of the Commission's discharge of its duties and responsibilities</u>.

(O'Brien Decl., Ex. H) (emphasis added).  In giving the SEC unfettered discretion to disclose the allegedly protected materials whenever it decides that disclosure "would be in furtherance of the Commission's discharge of its duties and responsibilities," the agreement provides for an exception that swallows the rule.  <u>See</u> <u>In re Stone Energy Corp.</u>, No. 05-2088, 2008 WL 4868086, at *6 (W.D. La. Nov. 4, 2008) ("the confidentiality agreement between Stone and the SEC gave the SEC broad discretion to disclose the documents 'in furtherance of the Commission[]'s discharge of its duties and responsibilities,' and therefore gave little expectation of privacy to Stone")  Where one party to a contract has, as here, "the unilateral right to cancel," the agreement is illusory.  <u>See</u>, <u>e.g.</u>, <u>Dorman v. Cohen</u>, 66 A.D.2d 411, 415 (1st Dept. 1979). There is no reason to believe that the <u>Steinhardt</u> court intended that an illusory agreement of the sort at issue here – essentially a fig leaf that permits the producing party to claim, as to third parties, that attorney-client privilege and work product protection are preserved – would justify setting aside the standard rule that materials provided to an adversary lose attorney-client privilege and work product protection.  A contrary finding would exalt form over substance.

**B.    Other Circuit Authority Concerning the Effect of
<u>Confidentiality Agreements with Government Agencies</u>**

At least in the context of precedential decisions, the Courts of Appeal have uniformly rejected the argument that a producing party can preserve the attorney-client privilege

and work product protection as to documents produced to an adverse government agency

through use of a confidentiality agreement.

In In re Pacific Pictures Corporation, 679 F.3d 1121 (9th Cir. 2012), for example,

the Ninth Circuit – relying in part on the reasoning of Steinhardt – observed that

> Petitioners have provided no convincing reason that post hoc contracts regarding
> how information may be revealed encourage frank conversation at the time of the
> advice.  Indeed, as the Sixth Circuit has noted, while this approach "certainly
> protects the expectations of the parties to the confidentiality agreement, it does
> little to serve the 'public ends' of adequate legal representation that the attorney-
> client privilege is designed to protect."  In re Columbia/HCA Healthcare Corp.
> Billing Practices Litig., 293 F.3d 289, 303 (6th Cir. 2002).  Instead, recognizing
> the validity of such a contract "merely [adds] another brush on an attorney's
> palette [to be] utilized and manipulated to gain tactical or strategic advantage."
> Steinhardt, 9 F.3d at 235.  And it would undermine the public good of promoting
> an efficient judicial system by fostering uncertainty and encouraging litigation.

In re Pacific Pictures Corp., 679 F.3d at 1128-29 (quoting Steinhardt, 9 F.3d at 235) (other

citations omitted).  The court went on to hold that the attorney-client privilege had been waived

as to documents produced to the U.S. Attorney's Office, despite the existence of a confidentiality

agreement.  Id. at 1129.

The Sixth Circuit has also rejected the argument that a confidentiality agreement

preserves attorney-client privilege and work product protection as to materials disclosed to an

adverse government agency.  In In re Columbia/HCA Healthcare Corporation Billing Practices

Litigation, 293 F.3d 289 (6th Cir. 2002), the Department of Justice ("DOJ") was investigating

Columbia/HCA for Medicare and Medicaid fraud.  Id. at 291.  Columbia/HCA began

negotiations with DOJ concerning a possible settlement of the fraud investigation and, in

connection with those negotiations, produced to the Government internal audits of its Medicare

patient records and related documents.  Id. at 292.  The disclosures were governed by a

confidentiality agreement between Columbia/HCA and DOJ.  Id.  Private insurance companies

16

subsequently sued Columbia/HCA and moved to compel production of the internal audits.  Id. at

292-93.  Columbia/HCA refused to produce these documents, arguing that disclosure to the DOJ

had not waived the attorney-client privilege and work product protection, given the

confidentiality agreement.  Id. at 293.

        In affirming the district court's order compelling Columbia/HCA to produce the

documents, the Sixth Circuit ruled that both attorney-client privilege and work product

protection had been waived in documents Columbia/HCA had provided to DOJ during the fraud

investigation.  Id. at 302-03, 306-07.  The court also commented that the Government should not

"assist in obfuscating the 'truth-finding process' by entering into such confidentiality agreements

. . . . The investigatory agencies of the Government should act to bring to light illegal activities,

not to assist wrongdoers in concealing the information from the public domain."  Id. at 303.

        The law in the Third Circuit is the same.  In Westinghouse Electric Corporation v.

Republic of the Philippines, 951 F.2d 1414 (3d Cir. 1991), Westinghouse disclosed to the SEC

and to DOJ certain documents generated by its outside counsel, which had conducted an internal

investigation of allegations that Westinghouse had obtained contracts by bribing foreign

officials.  Id. at 1417.  After concluding that Westinghouse was in an adversarial relationship vis-

à-vis the SEC and DOJ – which were conducting an investigation of Westinghouse – the court

noted that "a party who discloses documents protected by the work-product doctrine may

continue to assert the doctrine's protection only when the disclosure furthers the doctrine's

underlying goal."  Id. at 1425, 1429.  In holding that Westinghouse had waived both attorney-

client and work product protection for the documents it had produced to government agencies,

the court noted that "[w]hen a party discloses protected materials to a government agency

investigating allegations against it, it uses those materials to forestall prosecution (if the charges

are unfounded) or to obtain lenient treatment (in the case of well-founded allegations).  These objectives, however rational, are foreign to the objectives underlying the work-product doctrine." Id. at 1429.  Rather than promoting the goals of the work-product doctrine, the Third Circuit reasoned that "[c]reating an exception for disclosures to government agencies may actually hinder the operation of the work-product doctrine.  If internal investigations are undertaken with an eye to later disclosing the results to a government agency, the outside counsel conducting the investigation may hesitate to pursue unfavorable information or legal theories about the corporation."  Id. at 1429-30.

   The Third Circuit found that DOJ's agreement not to disclose the information did not preserve either the attorney-client privilege or work product protection vis-à-vis third parties. As to attorney-client privilege, the court noted that "under traditional waiver doctrine a voluntary disclosure to a third party waives the attorney-client privilege even if the third party agrees not to disclose the communications to anyone else."  Id. at 1427.  As to work product, the court held that the confidentiality agreement did not preserve protection where Westinghouse had "deliberately disclosed work product to two government agencies investigating allegations against it."  Id. at 1431; see also id. at 1430 ("We also reject Westinghouse's argument that it did not waive the work-product protection because it reasonably expected the agencies to keep the documents it disclosed to them confidential.").

   Similarly, in In re Qwest Communications International Inc., 450 F.3d 1179 (10th Cir. 2006), the Tenth Circuit rejected a selective waiver argument, despite the presence of a confidentiality agreement governing disclosures to the SEC and DOJ.  In reaching this result, the court noted that the confidentiality agreements gave the government broad discretion to disclose the purportedly protected material:  "[t]he record does not support reliance on the Qwest

agreements with the SEC and the DOJ to justify selective waiver. . . . [T]he confidentiality

agreements gave the agencies broad discretion to use the Waiver Documents as they saw fit. . . ."

Id. at 1194; see also In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d

844, 846-47 (8th Cir.1988) (disclosure of tape to class action plaintiffs during settlement

discussions waived work-product protection as to the government, despite non-disclosure

agreement with class action plaintiffs).[3]

*     *     *     *

In light of the consistent authority discussed above from a variety of circuit courts

throughout the nation, this Court is left with the "definite and firm conviction" that – in finding

no waiver – the magistrate judge was mistaken.  See Chowdhury, 639 F.3d at 585.

As discussed above, while the Steinhardt court's dicta suggests that there may be

circumstances in which privilege can be preserved through use of a confidentiality agreement,

there is no evidence that the Second Circuit had in mind the type of illusory agreement entered

into by Defendants here.  In any event, Steinhardt is now nearly twenty years old, and more

recent circuit court decisions have not permitted parties who produce documents to an adverse

government agency to assert attorney-client privilege and work product protection as to those

same documents when demanded by a third party in an unrelated litigation.

---

[3]  Courts in this district have split on the question of whether privilege can be maintained through
use of a confidentiality agreement.  Compare In re Natural Gas Commodity Litig., No. 03 Civ.
6186 (VM) (AJP), 2005 WL 1457666, at *8 (S.D.N.Y. June 21, 2005) ("[E]xplicit written
confidentiality and non-waiver agreements with the government agencies . . . go[] a long way to
a finding of non-waiver. . . .") and Police & Fire Retirement Sys. of the City of Detroit v.
SafeNet, Inc., No. 06 Civ. 5797 (PAC), 2010 WL 935317, at *2 (S.D.N.Y. Mar. 12, 2010) ("The
factual circumstances in this case favor applying the selective waiver doctrine. SafeNet produced
the Privileged Materials to the government, not private litigants, pursuant to Confidentiality
Agreements that provide for non-wavier.") with In re Initial Public Offering Sec. Litig., 249
F.R.D. 457, 466 (S.D.N.Y. 2008) ("Voluntary disclosure of attorney work product, regardless of
the existence of a confidentiality agreement, will waive work product privilege absent special
circumstances.").

Moreover, strategic and manipulative use of the attorney-client privilege and work product doctrine has been explicitly rejected by the Second Circuit.  As the Steinhardt court observed, "selective assertion of privilege should not be merely another brush on an attorney's palette, utilized and manipulated to gain tactical or strategic advantage."  Steinhardt, 9 F.3d at 235.  In choosing to produce in discovery the presumably favorable witness interview excerpts shown to the SEC – while refusing to produce the witness summaries and notes from which the favorable excerpts were drawn – Defendants have manipulated their evidentiary privileges to serve their interests.  See Permian Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("[A] client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.").

The reasons to reject selective, manipulative and strategic use of evidentiary privileges are numerous.  As an initial matter, because all evidentiary privileges impede the truth-finding process, they must be narrowly construed.  See, e.g., Trammel v. United States, 445 U.S. 40, 50 (1980) ("Testimonial exclusionary rules and privileges contravene the fundamental principle that '"the public . . . has a right to every man's evidence."'  As such, they must be strictly construed and accepted 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'") (citations omitted); see also Westinghouse, 951 F.2d at 1425 ("[B]ecause privileges obstruct the truth-finding process, the Supreme Court has repeatedly warned the federal courts to be cautious in recognizing new privileges.") (citing Univ. of Penn. v. EEOC, 493 U.S. 182 (1990)).

Recognizing selective waiver requires an exceedingly broad construction of the attorney-client and work-product privileges amounting to the creation of "an entirely new privilege." Westinghouse, 951 F.2d at 1425.  Recognition of such a new privilege is particularly inappropriate here, given that Congress "has declined broadly to adopt a new privilege to protect disclosures of attorney-client privileged materials to the government. . . ." Pacific Pictures, 679 F.3d at 1128.  The Supreme Court has been "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." Univ. of Pennsylvania, 493 U.S. at 189.

Judge Dolinger also suggested that the outcome might be different if Defendants had made "'repeated voluntary disclosures to adversarial parties.'" Gruss, 276 F.R.D. at 142 (quoting In re Initial Public Offering Sec. Litig., 249 F.R.D. 457, 466 (S.D.N.Y. 2008)).  But the general rule is that a one-time voluntary disclosure of privileged documents to an adverse party is sufficient to destroy both the attorney-client privilege and work product protection.  See Steinhardt, 9 F.3d at 235 ("Once a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears.").[4]

---

[4]  See also Steinhardt, 9 F.3d at 235 ("The waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties."); Mass. Inst. of Tech., 129 F.3d at 687 ("[D]isclosure to an adversary, real or potential, forfeits work product protection."); Jacob v. Duane Reade, Inc., No. 11 Civ. 0160 (JMO) (THK), 2012 WL 651536, at *3 (S.D.N.Y. Feb. 28, 2012) ("The attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship."); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc., No. 08 Civ. 7508 (SAS), 2011 WL 4716334, at *4 (S.D.N.Y. Oct. 3, 2011) ("[I]t is well-established that voluntary disclosure of confidential material to a third party typically waives any applicable attorney-client privilege. . . ."); Complex Sys., Inc. v. ABN AMRO Bank N.V., 279 F.R.D. 140, 147 (S.D.N.Y. 2011) ("Work product protection is waived by the disclosure of documents to third parties . . . if the disclosure 'substantially increases the opportunity for potential adversaries to obtain the information.'") (quoting In re Pfizer Inc. Sec. Litig., No. 90 Civ. 1260 (SS), 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993)).

Judge Dolinger also noted that this is not "a situation where – as in In re [Initial Public Offering Securities Litigation] – plaintiff seeks disclosure of the same materials already produced to other parties; instead, plaintiff seeks disclosure of additional documents underlying what was disclosed to the SEC." Gruss, 276 F.R.D. at 142. Defendants have not argued to this Court, however, that the attorney notes and summaries of witness interviews are protected from disclosure because only excerpts of these materials were disclosed to the SEC. In any event, the law is to the contrary.

As a general matter, when a party selectively discloses attorney-client communications to an adverse government entity, the privilege is waived not only as to the materials provided, but also as to the underlying source materials. In re Kidder Peabody Securities Litigation, 168 F.R.D. 459 (S.D.N.Y. 1996) is illustrative. In that case, shareholders sought production of notes and summaries created by outside counsel for the defendant corporation when the attorneys interviewed the defendant's employees as part of an internal investigation into financial irregularities that gave rise to the litigation. 168 F.R.D. at 461-62. Defendant's counsel incorporated excerpts of these interviews into a draft report that was provided to the SEC as part of an effort to convince the Commission that the financial irregularities were "the work of one employee, acting alone." Id. at 462, 464, 468, 470-71. The court found that "[t]he submission of the draft report to the SEC at a time when the Commission was considering the question of who was responsible for the scandal suffices to waive any privilege for the underlying documents." Id. at 472; see also In re Martin Marietta Corp., 856 F.2d 619, 623 (4th Cir. 1988) (attorney-client privilege waived as to attorneys' notes of interviews where interviews were incorporated into position paper provided to United States Attorney); United States v. Treacy, No. S2 08 Cr. 366 (JSR), 2009 WL 812033, at *1-2

(S.D.N.Y. Mar. 24, 2009) (requiring production of attorney interview memoranda produced to government or conveyed in detailed oral presentations).

   As with the attorney-client privilege, waiver of work product protection can occur where a party discloses the substance of attorney work product to a government entity.  For example, in Bank of America, N.A. v. Terra Nova Insurance Company, 212 F.R.D. 166 (S.D.N.Y. 2002), plaintiffs sought production of documents created by a consultant hired by defendant's counsel and voluntarily shared with two government agencies.  Id. at 168.  The documents were prepared by the consultant during an investigation into wrongdoing by one of defendant's employees.  Id.  The consultant and defendant's counsel orally presented the results of that investigation to the New York State Insurance Department and an Assistant United States Attorney.  Id.  The court held that, in making the presentation, the defendant had waived any work product privilege associated with the investigation, "be it the actual facts revealed to the government or the underlying documents upon which the presentation was based."  Id. at 175.  Accordingly, the court ordered the defendant to produce "any documents relating to the investigation that were in [the consultant's] possession as of [the date of the presentation to the governmental authorities,]" including but not limited to "any investigation documents actually given to the government agencies."  Id.; see also SEC v. Vitesse Semiconductor Corp., No. 10 Civ. 9239 (JSR), 2011 WL 2899082, at *3 (S.D.N.Y. July 14, 2011) (holding that corporation waived work product protection for attorney's handwritten notes of interviews of corporation's employees by providing oral summary of interviews to SEC).

   The situation is analogous here.  Excerpts of Defendants' attorneys' work product – the interview notes and summaries – were deliberately, voluntarily, and selectively disclosed to the SEC via the PowerPoint presentations.  As a result, any work product protection associated

23

with the factual portions of the interview notes and summaries was forfeited.  Because Plaintiff does not seek disclosure of portions of the interview notes and summaries that constitute opinion work product, the Court does not reach the issue of whether Defendants' waiver extends to such material.  See Fed. R. Civ. P. 26(b)(3)(B) ("If the court orders discovery of [work product] materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."); see also Bank of Am., 212 F.R.D. at 175 (defendants waived "fact" but not "opinion" work product by presenting to government authorities the facts gathered during attorney-directed internal investigation); In re Kidder Peabody Secs. Litig., 168 F.R.D. at 473 (ordering production of documents underlying final report prepared by attorney, but not materials deemed to "encompass core attorney mental processes").

## CONCLUSION

For the reasons stated above, the magistrate judge's July 14, 2011 ruling is clearly erroneous in holding that no waiver occurred when Defendants disclosed portions of the interview notes and summaries to the SEC.  Accordingly, the July 14, 2011 is reversed to that extent.  By July 17, 2013, Defendants will produce for this Court's in camera inspection interview notes and summaries pertaining to the twenty-one witnesses whose statements were disclosed to the SEC.  The Court will determine what portion of these documents constitutes opinion work product, and will order production of the rest.

Dated: New York, New York
      July 10, 2013

                        SO ORDERED.

                        Paul G. Gardephe
                        United States District Judge